**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

**ANNETTE DAFFIN**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**TRUVIEW BSI, LLC**,

Defendant.

Case No. _______________

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Annette Daffin ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant TruView BSI, LLC ("Defendant" or "TruView"), and alleges the following based upon personal knowledge with respect to Plaintiff and on information and belief derived from, among other things, investigation of counsel and review of public documents as to all other matters.

## SUMMARY OF THE CASE

1. Plaintiff brings this class action against Defendant for its failure to implement adequate and reasonable data security measures to protect the personally identifiable information ("PII" or "Private Information") of Plaintiff and Class Members from unauthorized access, resulting in a data breach disclosed by Defendant on or about April 8, 2026 (the "Data Breach").

2. TruView is a consumer reporting agency and nationwide provider of background screening, business intelligence, and investigative services, headquartered in Melville, New York, with an additional office in Arcadia, California. In the ordinary course of its business, Defendant collects, processes, and maintains highly sensitive PII—including names, Social Security numbers, driver's license numbers, financial account information, addresses, and medical information—

belonging to thousands of individuals across the United States who are the subjects of background investigations conducted on behalf of Defendant's employer, government, and institutional clients.

3. On March 4, 2026, Defendant confirmed that a cybercriminal may have accessed PII contained within Defendant's network environment during a period of unauthorized access spanning from approximately July 18, 2024, through August 15, 2024—a window of approximately twenty-nine days.[1] Upon becoming aware of the unauthorized activity, Defendant states that it notified law enforcement and engaged third-party cybersecurity specialists to conduct a forensic investigation.[2]

4. The PII compromised in the Data Breach includes, but is not limited to, names, Social Security numbers, and driver's license numbers.[3] Defendant has reported the Data Breach to the Offices of the Attorneys General of at least Maine, Texas, Massachusetts, New Hampshire, and California. According to these filings, the breach affected at least 702 Texas residents, 90 Massachusetts residents, 15 Maine residents, and 10 New Hampshire residents.[4] The total number of individuals affected nationwide has not been publicly disclosed but, upon information and belief, it exceeds 20,000 individuals.

5. On or about April 8, 2026—more than twenty-one months after the unauthorized access began and more than nineteen months after Defendant states that it confirmed the breach—

[1] *See* TruView BSI, LLC, Notice of Data Event, submitted to the Office of the Maine Attorney General (Apr. 8, 2026). https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d7dfb183-7e17-431a-afb5-5cb4ca52482b.html (last visited April 15, 2026).
[2] *Id*.
[3] *Id*.
[4] *See* TruView BSI, LLC, Notice of Data Event, Office of the Maine Attorney General (Apr. 8, 2026), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d7dfb183-7e17-431a-afb5-5cb4ca52482b.html; TruView BSI, LLC, Notice of Data Event, Office of the New Hampshire Attorney General (Apr. 8, 2026), https://mm.nh.gov/files/uploads/doj/remote-docs/truview-bsi-20260408.pdf; TruView BSI, LLC, Data Breach Report, Office of the Texas Attorney General, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "TruView") (last visited April 15, 2026).

Defendant began notifying affected individuals by U.S. Mail. Defendant's failure to detect the intrusion for approximately nineteen months, and its additional delay of more than one month between confirmation and notification, left Plaintiff and Class Members exposed to a prolonged period of heightened risk during which their compromised PII could be, and upon information and belief was, exploited without their knowledge.

6. Under New York law, a business that maintains computerized data including private information is required to notify affected persons "in the most expedient time possible and without unreasonable delay" and, in any event, within thirty days after the breach has been discovered.[5] Defendant discovered the breach on March 4, 2026, and did not begin notifying affected individuals until April 8, 2026—thirty-five days later—in apparent violation of this statutory deadline.

7. The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable data security practices and procedures to protect the PII in its custody, despite its obligation to do so as a consumer reporting agency entrusted with some of the most sensitive categories of personal information. Upon information and belief, Defendant failed to encrypt PII at rest and in transit, failed to implement adequate access controls and multifactor authentication, failed to deploy sufficient intrusion detection and monitoring systems, and failed to maintain an adequate incident response plan.

8. As a result of the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer damages, including but not limited to: (a) the compromise, publication, theft, and unauthorized use of their PII; (b) out-of-pocket expenses associated with the prevention, detection, recovery, and remediation of identity theft and fraud; (c) lost opportunity costs and the

---

[5] *See* N.Y. Gen. Bus. Law § 899-aa(2).

expenditure of time associated with attempting to mitigate the consequences of the Data Breach; (d) the diminished value of their PII; (e) the loss of the benefit of the bargain they struck when they provided their PII in exchange for services that were to include the safeguarding of that information; (f) anxiety, emotional distress, and loss of privacy; (g) the continued and ongoing risk to their PII, which remains in Defendant's possession and is subject to further breaches; and (h) future costs that will be expended to prevent, detect, contest, remediate, and repair the consequences of the Data Breach for the remainder of their lives.

9. Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals by asserting claims for negligence, breach of implied contract, unjust enrichment, and declaratory and injunctive relief.

## PARTIES

10. Plaintiff Annette Daffin is a natural person and citizen of the State of Tennessee. Plaintiff resides in Clarksville, Tennessee. Upon information and belief, Plaintiff's PII was collected and maintained by Defendant in connection with a background screening investigation conducted on behalf of one or more of Defendant's clients. Defendant's records identified Plaintiff under her maiden name, Annette Tucker. On or about April 8, 2026, Plaintiff received a notice letter from Defendant informing her that her name and Social Security number were potentially involved in the Data Breach.

11. Defendant TruView BSI, LLC is a limited liability company organized under the laws of the State of New York, with its principal place of business at 225 Broadhollow Road, Suite 304, Melville, New York 11747. Defendant also maintains an office at 444 East Huntington Drive, Suite 305, Arcadia, California 91006. Defendant is a consumer reporting agency as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681a(f), and a certified Service-Disabled Veteran-Owned

Business. Founded in 2005, Defendant provides background screening, business intelligence, and investigative services to clients nationwide, including Fortune 500 companies, government agencies, educational institutions, and nonprofit organizations. Upon information and belief, Defendant's president is Nicholas M. Auletta, who is a citizen of the State of New York. Upon information and belief, all of Defendant's members are citizens of the State of New York.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act, or "CAFA") because: (a) there are 100 or more members in the proposed class;[6] (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (c) at least one member of the proposed class is a citizen of a state different from Defendant. The aggregate claims of the Class Members, including compensatory damages, restitution, disgorgement, and the value of the injunctive and declaratory relief sought, exceed $5,000,000 in the aggregate, exclusive of interest and costs.

13. Defendant is a limited liability company. For purposes of CAFA, 28 U.S.C. § 1332(d)(10) provides that an unincorporated association is deemed to be a citizen of the state where it has its principal place of business and the state under whose laws it is organized. Defendant's principal place of business is in New York, and it is organized under New York law. Defendant is therefore a citizen of New York under § 1332(d)(10).

14. Additionally, and in the alternative, to the extent the Court applies the traditional member-citizenship test for determining the citizenship of a limited liability company, upon

---

[6] *See* TruView BSI, LLC, Notice of Data Event, Office of the Maine Attorney General (Apr. 8, 2026), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/d7dfb183-7e17-431a-afb5-5cb4ca52482b.html; TruView BSI, LLC, Notice of Data Event, Office of the New Hampshire Attorney General (Apr. 8, 2026), https://mm.nh.gov/files/uploads/doj/remote-docs/truview-bsi-20260408.pdf; TruView BSI, LLC, Data Breach Report, Office of the Texas Attorney General, https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (search "TruView") (last visited April 15, 2026).

information and belief, all of Defendant's members are citizens of the State of New York. Defendant is therefore a citizen of New York under either the CAFA statutory test or the traditional member-citizenship analysis. Plaintiff is a citizen of Tennessee, establishing minimal diversity.

15. This Court has personal jurisdiction over Defendant because Defendant maintains its principal place of business in this District, conducts substantial business in this District, and collected and stored the PII of Plaintiff and Class Members in this District.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant maintains its principal place of business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including Defendant's collection, storage, and failure to protect the PII of Plaintiff and Class Members.

## FACTUAL ALLEGATIONS

***Defendant Collected, Maintained, and Stored Plaintiff's and Class Members' PII***

17. TruView is a consumer reporting agency and nationwide provider of background screening and investigative services. Defendant's services include employment background screening, criminal history checks, Social Security number verification and tracing, identity verification, driver history reports, drug testing coordination, workplace investigations, surveillance operations, and due diligence investigations.

18. In the course of providing these services, Defendant routinely collects, processes, stores, and maintains highly sensitive PII belonging to the subjects of its investigations. This PII includes full names, Social Security numbers, dates of birth, driver's license numbers, addresses, employment histories, financial information, and, in certain contexts, medical information.

19. The individuals whose PII Defendant collects are overwhelmingly not Defendant's direct clients. They are consumers—job applicants, employees, tenants, and others—whose

employers, prospective employers, landlords, or other third parties contracted with Defendant to perform background screening. These individuals typically have no practical alternative to providing their PII and no direct ability to control or monitor how Defendant stores, secures, or disposes of it.

20. As a consumer reporting agency under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681 et seq., Defendant is subject to federal statutory obligations regarding the accuracy, security, and permissible use of consumer information. Defendant is also subject to the data security requirements of the New York SHIELD Act, N.Y. Gen. Bus. Law § 899-bb, which requires any person or business that owns or licenses computerized data that includes private information of a New York resident to develop, implement, and maintain reasonable safeguards to protect the security, confidentiality, and integrity of that information.

21. Defendant's Privacy Policy represents that Defendant "is committed to protecting the personal information it receives from and about consumers" and that personal information will be stored "in a secure manner." Plaintiff and Class Members relied on these representations.

22. Defendant used Plaintiff's and Class Members' PII in its business to derive economic benefits. Defendant could not operate or generate revenue without collecting and maintaining the PII of the individuals who are the subjects of its background screening reports. By obtaining, using, and benefitting from this PII, Defendant assumed legal and equitable duties to protect it from unauthorized access and disclosure.

***The Data Breach***

23. On or about April 8, 2026, Defendant sent Plaintiff and Class Members notice letters by U.S. Mail informing them that a cybercriminal may have accessed PII within

Defendant's environment between July 18, 2024, and August 15, 2024. According to the notice, Defendant confirmed the breach on March 4, 2026.

24. The unauthorized access therefore persisted for approximately twenty-nine days before the access window closed, and Defendant did not discover or confirm the breach for approximately nineteen months after the intrusion began. During that entire period, Plaintiff and Class Members were unaware that their PII had been compromised and were unable to take any protective measures.

25. Upon information and belief, a cybercriminal gained unauthorized access to Defendant's network and accessed files containing the PII of Plaintiff and Class Members. Defendant's filing with the Maine Attorney General's Office described the breach as an "External system breach (hacking)."

26. The PII compromised in the Data Breach includes names, Social Security numbers, and driver's license numbers. Defendant has reported the Data Breach to the Offices of the Attorneys General of at least Maine, Texas, Massachusetts, New Hampshire, and California. According to these filings, the breach affected at least 702 Texas residents, 90 Massachusetts residents, 15 Maine residents, and 10 New Hampshire residents. The total number of individuals affected nationwide has not been publicly disclosed.

27. Even after confirming the Data Breach on March 4, 2026, Defendant waited until April 8, 2026—thirty-five days—to begin notifying affected individuals. Under New York law, notification must be made "in the most expedient time possible and without unreasonable delay" and "within thirty days after the breach has been discovered."[7] Defendant's thirty-five-day delay

[7] N.Y. Gen. Bus. Law § 899-aa(2).

exceeded this statutory deadline, depriving Plaintiff and Class Members of the opportunity to begin mitigating the consequences of the breach at the earliest possible time.

28. Defendant offered affected individuals access to single-bureau credit monitoring, credit report, and credit score services for twelve months through CyberScout, a TransUnion company. As discussed below, this remediation is inadequate relative to the scope and duration of risk created by the compromise of immutable identifiers such as Social Security numbers.

***Defendant's Data Security Obligations***

29. Defendant had a duty to implement and maintain reasonable data security practices to protect the PII it collected and stored. This duty arose from multiple sources, including: (a) Defendant's voluntary undertaking to collect and store highly sensitive PII; (b) the special relationship between Defendant and the consumers whose PII it collected, who had no practical alternative to providing their data and no ability to monitor Defendant's security practices; (c) Defendant's representations in its Privacy Policy; (d) the FCRA's requirements applicable to consumer reporting agencies; and (e) the New York SHIELD Act's express requirement that businesses maintaining private information of New York residents implement reasonable safeguards.[8]

30. The FTC has long treated failures to implement reasonable data security measures as unfair acts or practices under Section 5 of the FTC Act.[9] Decades of FTC enforcement actions and guidance have established that reasonable data security is a settled regulatory expectation.[10] The FTC has published detailed guidance on the specific measures that constitute reasonable

[8] N.Y. Gen. Bus. Law § 899-bb.
[9] 15 U.S.C. § 45(a).
[10] *See* Fed. Trade Comm'n, Data Security (resource page), https://www.ftc.gov/business-guidance/privacy-security/data-security.

security, including access controls, strong authentication, network segmentation and monitoring, timely patching, encryption of sensitive data, and secure development practices.[11]

31. The National Institute of Standards and Technology ("NIST") has published widely recognized catalogs of security and privacy controls that serve as objective benchmarks for reasonable security.[12] NIST has also published detailed guidance on incident response as a core component of cybersecurity risk management.[13]

32. The Center for Internet Security ("CIS") has published the CIS Critical Security Controls, which represent consensus industry best practices including asset inventory, access control, continuous vulnerability management, audit log management, email and web browser protections, malware defenses, network monitoring, incident response management, and penetration testing.[14]

33. The Cybersecurity and Infrastructure Security Agency ("CISA") has published guidance identifying cyberattacks as well-known, evolving threats and has recommended controls including backups, phishing resistance, patching, multifactor authentication, least privilege, network segmentation, logging, monitoring, and incident response planning.[15] CISA also

---

[11] *See* Fed. Trade Comm'n, Start with Security: A Guide for Business (June 2015); Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business (Oct. 2016).

[12] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., Security and Privacy Controls for Information Systems and Organizations, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.

[13] *See* Nat'l Inst. of Standards & Tech., Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.

[14] *See* Ctr. for Internet Sec., CIS Critical Security Controls (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.

[15] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., #StopRansomware Guide (initial release Sept. 2020; updated Mar. 2025), https://www.cisa.gov/sites/default/files/2025-03/StopRansomware-Guide%20508.pdf.

maintains a continuously updated catalog of known exploited vulnerabilities, demonstrating that timely patching is a baseline cybersecurity function.[16]

34. Upon information and belief, Defendant failed to meet the minimum standards of these widely accepted frameworks. Defendant's specific failures include, but are not limited to: (a) failing to encrypt PII at rest and in transit; (b) failing to implement adequate access controls and multifactor authentication; (c) failing to deploy sufficient intrusion detection and monitoring systems capable of detecting the unauthorized access within a reasonable time; (d) failing to conduct regular security assessments and penetration testing; (e) failing to implement adequate network segmentation to limit lateral movement within its environment; (f) failing to maintain adequate logging and monitoring of network activity; (g) failing to implement timely patching and vulnerability management; (h) failing to maintain an adequate incident response plan; and (i) failing to delete PII that was no longer needed for legitimate business purposes. Defendant's failure to detect the unauthorized intrusion for approximately nineteen months is itself strong evidence of deficient monitoring and detection capabilities.

***The Data Breach Was Foreseeable***

35. The risk of a data breach was well known and foreseeable to Defendant. Cyberattacks targeting companies that collect and store sensitive PII have been widely reported and increasing in frequency. According to the Identity Theft Resource Center, the number of data compromises in the United States reached record highs in recent years.[17]

36. Background screening companies are particularly attractive targets for cybercriminals because they aggregate large volumes of the most sensitive categories of PII—

[16] *See* Cybersecurity & Infrastructure Sec. Agency, Known Exploited Vulnerabilities Catalog, https://www.cisa.gov/known-exploited-vulnerabilities-catalog.
[17] *See* Identity Theft Res. Ctr., 2025 Data Breach Report (Jan. 2026).

Social Security numbers, driver's license numbers, financial records, and criminal histories—for thousands of individuals who have no direct ability to monitor how that data is secured. The aggregation of such data in a single environment creates a high-value target.

37. In light of high-profile data breaches at companies across industries in 2024 and 2025, and in light of the FBI's and CISA's repeated public warnings about cyber threats, Defendant knew or should have known that its electronic records would be targeted by cybercriminals. The threat landscape for companies in possession of sensitive PII has been widely documented and publicized.

38. The FTC has brought numerous enforcement actions against businesses for failing to adequately protect consumer data. These actions, and the resulting orders, were publicly available and put Defendant on notice of its obligations and of the consequences of failing to implement reasonable data security.

39. Despite the well-documented and foreseeable risk of a cyberattack, Defendant failed to take adequate measures to protect the PII entrusted to it.

***Defendant's Own Representations Regarding Data Security***

40. Defendant's Privacy Policy states that Defendant "is committed to protecting the personal information it receives from and about consumers" and that personal information will be stored "in a secure manner."

41. In its notice letter to affected individuals, Defendant stated that it "takes the confidentiality, privacy, and security of information in its care very seriously."

42. Despite these representations, Defendant failed to implement data security measures adequate to prevent a cybercriminal from accessing its systems undetected for approximately twenty-nine days and failed to discover the intrusion for approximately nineteen

additional months. Defendant's conduct was inconsistent with its own representations and fell below the applicable standard of care.

***Value of the Compromised PII and the Immutable Nature of Social Security Numbers***

43. Social Security numbers are among the most sensitive and valuable forms of PII. Unlike credit card numbers, which can be cancelled and reissued, Social Security numbers are generally immutable and cannot be easily replaced. Once compromised, a Social Security number can be used to commit identity theft, tax fraud, benefits fraud, employment fraud, financial fraud, and other crimes.[18] The Social Security Administration has warned that each time an individual's Social Security number is compromised, the potential for a thief to gain access to bank accounts, credit cards, driving records, tax and employment histories, and other private information increases.

44. It is no easy task to change or cancel a compromised Social Security number. An individual cannot obtain a new Social Security number without significant documentation and evidence of actual, ongoing misuse. Even when a new number is issued, credit bureaus and financial institutions can quickly link the new number to the old one, undermining the effectiveness of the change. This means that the exposure of a Social Security number in a data breach creates a risk that persists indefinitely.

45. Driver's license numbers, also compromised in the Data Breach, are similarly difficult to replace and can be used to create fraudulent identification documents and facilitate identity theft.

46. The combination of names, Social Security numbers, and driver's license numbers compromised in the Data Breach provides cybercriminals with the essential building blocks

[18] *See* Soc. Sec. Admin., Identity Theft and Your Social Security Number (2018).

needed to assume an individual's identity. This combination is particularly valuable on the dark web and in underground criminal markets, where it can be packaged into "Fullz"—comprehensive identity profiles compiled by combining multiple data points from a single victim—and sold to other criminals for use in opening bank accounts, applying for credit, filing fraudulent tax returns, obtaining government benefits, and other schemes.

47. Misuse of stolen data may not be immediate. The FTC has recognized that identity thieves may hold stolen information for extended periods before exploiting it.[19] The U.S. Government Accountability Office has similarly recognized that stolen data may remain dormant for a year or more before misuse and can cause harm for years afterward.[20] Plaintiff and Class Members therefore face a substantial and ongoing risk of identity theft and fraud for years to come.

***Inadequacy of Defendant's Response***

48. Defendant's response to the Data Breach has been inadequate in multiple respects.

49. First, Defendant failed to detect the unauthorized access for approximately nineteen months, from July 2024 to March 2026. During this entire period, Plaintiff and Class Members were unaware that their PII had been compromised and were unable to take protective measures.

50. Second, even after confirming the Data Breach on March 4, 2026, Defendant waited thirty-five days—until April 8, 2026—to begin notifying affected individuals, in apparent violation of the thirty-day statutory deadline under N.Y. Gen. Bus. Law § 899-aa(2). This delay further prolonged Plaintiff's and Class Members' exposure.

51. Third, Defendant offered only single-bureau credit monitoring for twelve months. This remediation is inadequate. Single-bureau monitoring fails to capture activity reported to the

---

[19] *See* Ari Lazarus, Fed. Trade Comm'n, How Fast Will Identity Thieves Use Stolen Info? (May 24, 2017).

[20] *See* U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/products/gao-07-737.

other two major credit bureaus, and a twelve-month term is wholly disproportionate to the indefinite duration of risk created by the compromise of immutable identifiers like Social Security numbers. The retail cost of adequate credit and identity theft monitoring can exceed $200 or more per year, representing a significant ongoing expense that Plaintiff and Class Members would not need to bear but for Defendant's failures.

52. Fourth, Defendant's notice letters varied in the data elements disclosed. Plaintiff's individual notice letter identified only her name and Social Security number as compromised, while state attorney general filings indicate a broader set of data elements was involved. This inconsistency hampered Plaintiff's ability to assess and respond to the full scope of risk.

53. To date, Defendant has done nothing beyond the inadequate credit monitoring offering to provide Plaintiff and Class Members with relief for the damages they have suffered.

**PLAINTIFF'S EXPERIENCE AND INJURIES**

54. Upon information and belief, Plaintiff Annette Daffin's PII was collected and maintained by Defendant in connection with a background screening investigation performed on behalf of one of Defendant's clients. Defendant's records identified Plaintiff under her maiden name, Annette Tucker.

55. On or about April 8, 2026, Plaintiff received a notice letter from Defendant addressed to "Annette Tucker" at her home address in Clarksville, Tennessee. The notice informed Plaintiff that a cybercriminal may have accessed PII within Defendant's environment between July 18, 2024, and August 15, 2024, and that the information potentially involved includes her name and Social Security number.

56. Plaintiff trusted Defendant to use reasonable measures to protect her PII. Plaintiff is careful about sharing her sensitive personal information and stores documents containing such information in a safe and secure location.

57. Since the Data Breach, Plaintiff has experienced a noticeable increase in spam telephone calls and spam email messages.

58. Since the Data Breach, Plaintiff has been notified that her personal information has been found on the dark web.

59. Plaintiff fears for the security of her PII. As a result of the Data Breach, Plaintiff has suffered and will continue to suffer anxiety, stress, and concern about the misuse of her personal information.

60. Plaintiff faces a substantial and ongoing risk of identity theft and fraud as a result of the compromise of her Social Security number and other PII in the Data Breach. Because Social Security numbers are immutable, this risk will persist indefinitely.

61. Plaintiff has spent and will continue to spend time and effort monitoring her financial accounts and credit reports for unauthorized activity, responding to the Data Breach notification, and taking other protective measures—valuable time she otherwise would have spent on work or personal activities. This time has been lost and cannot be recaptured.

62. Plaintiff further anticipates spending considerable time and money on an ongoing basis to mitigate and address harms caused by the Data Breach.

63. Plaintiff has a continuing interest in ensuring that her PII, which remains in Defendant's possession, is protected and safeguarded from further breaches.

## INJURIES AND DAMAGES SUFFERED BY PLAINTIFF AND CLASS MEMBERS

64. Plaintiff and Class Members are at a heightened risk of identity theft for years to come as a result of the Data Breach. Criminals who obtain PII through data breaches monetize the stolen information by selling it on the dark web to other criminals who use it to commit identity theft, open fraudulent accounts, file false tax returns, obtain government benefits, and engage in other fraudulent schemes.

65. Identity theft may go undetected for months or even years. Fraudulent tax returns are typically discovered only when a legitimate return is rejected. Fraudulent unemployment claims may not surface until law enforcement contacts the victim's employer. New-account fraud may not come to light until a debt collector contacts the victim. Plaintiff and Class Members will need to remain vigilant for years, and possibly their entire lives, as a result of Defendant's conduct.

66. PII has significant market value in both legitimate and illegitimate markets. By allowing the unauthorized exposure of Plaintiff's and Class Members' PII, Defendant caused a transfer of value to unauthorized third parties without any consideration paid to Plaintiff or Class Members. The rarity and exclusivity of the data has been irreversibly diminished.

67. Plaintiff and Class Members have spent and will continue to spend time on protective measures including placing fraud alerts and credit freezes, monitoring credit reports and financial accounts, changing passwords, reviewing account statements for unauthorized activity, contacting financial institutions, and researching the breach—all measures consistent with what the FTC recommends for data breach victims.[21]

68. Given the type of PII compromised—particularly Social Security numbers, which cannot be cancelled or reissued—and the indefinite duration of the risk created by their exposure,

---

[21] *See* U.S. Gov't Accountability Off., GAO-07-737 (noting that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record").

adequate identity theft monitoring will be necessary for a minimum of several years. The retail cost of credit monitoring and identity theft protection services can exceed $200 per year. This is a reasonable and necessary cost that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

69. By providing their PII to Defendant or authorizing its provision, Plaintiff and Class Members reasonably expected that Defendant would use reasonable security measures to safeguard that information. Defendant's failure to do so deprived Plaintiff and Class Members of the benefit of their bargain, as they received services that were of lesser value than they reasonably expected to receive.

## CLASS ACTION ALLEGATIONS

70. Plaintiff brings this action on behalf of herself and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), and proposes the following class:

> All individuals in the United States whose PII was compromised in the Data Breach announced by TruView BSI, LLC on or about April 8, 2026.

71. Excluded from the Class are: (a) Defendant and its parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; (b) all judges assigned to hear any aspect of this litigation and their immediate family members; and (c) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out.

72. Plaintiff reserves the right to amend the definition of the Class or to add subclasses if further information and discovery so warrant.

73. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Although the precise number is not yet publicly disclosed, upon information and belief the Class consists of at least several thousand individuals, based on the known affected populations in Texas (702), Massachusetts (90), Maine (15), and New Hampshire (10), and the fact that Defendant provides services nationwide. The Class is identifiable within Defendant's records.[22]

74. **Commonality.** Common questions of law and fact predominate over any questions affecting individual members. Common questions include but are not limited to: (a) whether Defendant owed a duty to protect the PII of Plaintiff and Class Members; (b) whether Defendant breached that duty by failing to implement reasonable data security measures; (c) whether Defendant's conduct was negligent; (d) whether Defendant's breach caused the Data Breach; (e) whether Defendant adequately and timely notified Plaintiff and Class Members; (f) whether Defendant's remediation measures were adequate; (g) whether Plaintiff and Class Members suffered damages; and (h) whether Plaintiff and Class Members are entitled to injunctive and declaratory relief.[23]

75. **Typicality.** Plaintiff's claims are typical of the claims of Class Members because Plaintiff and Class Members were all subject to the same conduct by Defendant—Defendant's failure to implement and maintain reasonable data security measures, resulting in the compromise of their PII in the same Data Breach.[24]

76. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to or in conflict with those of the Class Members. Plaintiff

[22] Fed. R. Civ. P. 23(a)(1).
[23] Fed. R. Civ. P. 23(a)(2).
[24] Fed. R. Civ. P. 23(a)(3).

has retained counsel experienced in prosecuting complex class actions, including data breach litigation, who will adequately represent the interests of the Class.[25]

77. **Predominance and Superiority.** Questions of law and fact common to the Class predominate over any questions affecting individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members are relatively small compared to the burden and expense of individual litigation, making it impracticable for most Class Members to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.[26]

78. **Injunctive and Declaratory Relief.** Defendant has acted on grounds that apply generally to the Class, so that final injunctive and declaratory relief is appropriate respecting the Class as a whole.[27]

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
*(On Behalf of Plaintiff and the Class)*

79. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80. Defendant had full knowledge of the sensitivity of the PII entrusted to it and the types of harm that Plaintiff and Class Members could and would suffer if that PII were disclosed to unauthorized persons. Defendant is in the business of collecting, storing, and maintaining the most sensitive categories of consumer data—Social Security numbers, driver's license numbers,

[25] Fed. R. Civ. P. 23(a)(4).
[26] Fed. R. Civ. P. 23(b)(3).
[27] Fed. R. Civ. P. 23(b)(2).

financial account information, and medical information—and understood the risks associated with maintaining such data.

81. Defendant solicited, gathered, and stored the PII of Plaintiff and Class Members as part of the operation of its background screening and investigative business. Plaintiff and Class Members had no practical ability to protect their PII once it was in Defendant's possession.

82. Upon accepting and storing the PII of Plaintiff and Class Members, Defendant undertook and owed a duty to Plaintiff and Class Members to exercise reasonable care to secure and safeguard that information and to use reasonable and legally compliant methods to do so.

83. This duty arose from: (a) Defendant's voluntary undertaking to collect, store, and maintain highly sensitive PII, including Social Security numbers, as part of its business operations; (b) the special relationship between Defendant and the consumers whose PII it collected, who had no practical alternative to providing their data and no ability to monitor Defendant's security practices; (c) Defendant's express representations in its Privacy Policy that it is "committed to protecting the personal information it receives from and about consumers" and that it will store personal information "in a secure manner"; and (d) applicable regulatory frameworks and industry standards, including the FCRA, the New York SHIELD Act (N.Y. Gen. Bus. Law § 899-bb), FTC guidance, and the NIST, CIS, and CISA frameworks identified in the Factual Allegations above.

84. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the PII in its custody, including adequate computational and network security, encryption, intrusion detection and prevention systems, firewalls, monitoring practices, access controls, multifactor authentication, and data retention and destruction policies.

85. Defendant owed a duty to Plaintiff and Class Members to implement processes by which it could detect in a timely manner whether its network had been breached or whether PII had been exposed to unauthorized actors. A reasonable entity in Defendant's position would have detected the unauthorized access that persisted for twenty-nine days and would not have required nineteen months to confirm the breach.

86. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion, to disclose the Data Breach in a timely and accurate manner, and to comply with the notification requirements of N.Y. Gen. Bus. Law § 899-aa(2) and analogous state breach notification statutes.

87. Defendant's duty to use reasonable security measures was further informed by authoritative frameworks and industry standards, including but not limited to: NIST SP 800-53 Rev. 5, NIST SP 800-61 Rev. 3, CIS Critical Security Controls v8.1, CISA guidance, and FTC guidance including Start with Security and Protecting Personal Information. These frameworks establish the standard of care for reasonable data security. Defendant failed to comply with these widely accepted standards.

88. Defendant breached its duties by failing to implement and maintain reasonable security practices and procedures to protect the PII in its possession. Defendant's specific negligent acts and omissions include, but are not limited to: (a) failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' PII; (b) failing to encrypt PII at rest and in transit; (c) failing to implement adequate access controls and multifactor authentication; (d) failing to implement and maintain intrusion detection and monitoring systems capable of detecting unauthorized access in a timely manner; (e) failing to conduct regular security assessments and penetration testing; (f) failing to implement adequate network segmentation; (g)

failing to maintain adequate logging and monitoring of network activity; (h) failing to implement timely patching and vulnerability management; (i) failing to maintain an adequate incident response plan; (j) failing to adequately train employees on cybersecurity protocols and red flags; (k) failing to delete PII that was no longer needed for legitimate business purposes; (l) failing to warn Plaintiff and Class Members of its inadequate data security practices; and (m) failing to adequately monitor or supervise its data security practices.

89. Had Defendant implemented data security measures consistent with the standards and frameworks identified herein, the Data Breach would have been avoided, or its resulting damage to Plaintiff and the Class would have been at least significantly reduced and the amount of PII compromised could have been greatly lessened.

90. Defendant knew or should have known that its failure to exercise due care in collecting, storing, and securing the PII of Plaintiff and Class Members involved an unreasonable risk of harm to Plaintiff and Class Members, even if the harm occurred through the criminal acts of a third party, which criminal acts Defendant had good reason to anticipate in light of the well-known, widely reported, and increasing frequency of cyberattacks targeting entities that store sensitive consumer data.

91. A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class were reasonably foreseeable, particularly in light of Defendant's inadequate security practices, the sensitivity of the PII in its possession, and the known frequency of cyberattacks in Defendant's industry.

92. Plaintiff and Class Members were the foreseeable and probable victims of Defendant's inadequate security practices. The breadth of data compromised in the Data Breach

makes the information particularly valuable to identity thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, financial fraud, and other harms.

93. But for Defendant's wrongful and negligent breaches of its duties, the Data Breach would not have occurred, Plaintiff's and Class Members' PII would not have been compromised, and their injuries would have been avoided.

94. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer injuries and damages, including but not limited to: (a) invasion of privacy; (b) lost or diminished value of their PII; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the consequences of the Data Breach, including lost time; (e) loss of benefit of their bargain; (f) anxiety, emotional distress, and loss of privacy; and (g) the continued and ongoing risk to their PII, which remains in Defendant's possession and subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect it.

95. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages in an amount to be proven at trial.

96. Plaintiff seeks injunctive relief on behalf of the Class in the form of an order: (a) compelling Defendant to institute appropriate data security safeguards with regard to PII; (b) compelling Defendant to provide detailed and specific disclosure of what types of PII have been compromised as a result of the Data Breach; and (c) compelling Defendant to provide or extend credit monitoring and identity theft protection services to protect against the ongoing risk of harm.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
*(On Behalf of Plaintiff and the Class)*

97. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

98. Defendant required Plaintiff and Class Members to provide and entrust their PII to Defendant, or to authorize third parties to provide their PII to Defendant, as a condition of the background screening services Defendant performs.

99. When Plaintiff and Class Members provided their PII to Defendant, or when their PII was provided to Defendant on their behalf, they entered into implied contracts with Defendant pursuant to which Defendant agreed to safeguard and protect such PII using reasonable and legally compliant security measures.

100. The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Defendant included Defendant's promises to protect PII from unauthorized disclosures through reasonable safeguards. Plaintiff and Class Members provided their PII in reliance on these promises.

101. Under the implied contracts, Defendant was obligated to: (a) provide background screening services; (b) protect the PII provided in connection with those services from unauthorized access and disclosure; and (c) maintain the privacy and confidentiality of the PII it collected. In exchange, Plaintiff and Class Members agreed to provide their PII.

102. Defendant's Privacy Policy further evidences the terms of the implied agreement. The Privacy Policy represents that Defendant is "committed to protecting the personal information it receives from and about consumers" and that personal information will be stored "in a secure

manner." Defendant's adequate protection of Plaintiff's and Class Members' PII was a material aspect of these implied contracts.

103. Defendant solicited and invited Plaintiff and Class Members, or the third parties acting on their behalf, to provide PII as part of Defendant's regular business practices. A meeting of the minds occurred when PII was provided as a condition of Defendant's services and Defendant accepted, retained, and used that PII.

104. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with industry standards and relevant laws, including the FCRA, the New York SHIELD Act, and FTC guidance.

105. Plaintiff and Class Members fully performed their obligations under the implied contracts when they provided their PII or authorized its provision to Defendant.

106. Defendant materially breached its contractual obligations to protect the PII when that PII was disclosed without authorization in the Data Breach due to Defendant's inadequate data security measures and procedures. Defendant's specific breaches include failing to comply with industry standards and the standards of conduct embodied in applicable laws, and failing to otherwise protect Plaintiff's and Class Members' PII, as set forth in the Factual Allegations above.

107. The Data Breach was a reasonably foreseeable consequence of Defendant's conduct in breach of these implied contracts.

108. Had Defendant disclosed that its data security procedures were inadequate or that they did not adhere to applicable law or industry standards, neither Plaintiff, Class Members, nor any reasonable person would have provided PII to Defendant.

109. As a result of Defendant's failures to fulfill the data security protections promised, Plaintiff and Class Members did not receive the full benefit of their bargains with Defendant, and

instead received services of a diminished value compared to that described in the implied contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with adequate data security protection they expected and that which they received.

110. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages, and/or restitution, in an amount to be proven at trial.

## COUNT III
## UNJUST ENRICHMENT
*(In the Alternative, On Behalf of Plaintiff and the Class)*

111. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112. This Count is pled in the alternative to Count II.

113. Plaintiff and Class Members conferred a monetary and non-monetary benefit on Defendant. Specifically, they provided their PII to Defendant, either directly or through third parties. In exchange, Plaintiff and Class Members should have had their PII protected with adequate data security.

114. Defendant knew Plaintiff and Class Members conferred a benefit upon it and accepted and retained that benefit by accepting, retaining, using, and profiting from managing the PII entrusted to it. Defendant profited from Plaintiff's and Class Members' PII and used it for business purposes and to generate revenue, including by providing background screening reports to its clients based on that data. Defendant could not operate or generate revenue without collecting and maintaining the PII of the individuals who are the subjects of its investigations.

115. Defendant failed to use reasonable or adequate measures to secure Plaintiff's and Class Members' PII and therefore did not fully compensate Plaintiff or Class Members for the value that their PII provided.

116. Defendant acquired and retained the PII through inequitable means, as it failed to investigate and disclose the inadequacy of its data security practices and failed to maintain reasonable safeguards despite knowing the sensitivity of the data in its possession.

117. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures, while simultaneously profiting from the very PII it failed to protect. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant chose to use cheaper, ineffective security measures, and diverted those funds to its own operations. Plaintiff and Class Members suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the security of their PII.

118. Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

119. Plaintiff and Class Members are entitled to full restitution and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant as a result of its wrongful conduct, in an amount to be determined at trial.

## COUNT IV
## DECLARATORY AND INJUNCTIVE RELIEF
*(On Behalf of Plaintiff and the Class)*
*28 U.S.C. §§ 2201–2202*

120. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

121. Pursuant to 28 U.S.C. §§ 2201–2202, the Court may declare the rights of the parties and grant further necessary or proper relief in any case of actual controversy within its jurisdiction.

122. An actual controversy exists between the parties regarding Defendant's ongoing obligations to protect the PII of Plaintiff and Class Members and to provide adequate remediation for the Data Breach.

123. Defendant's PII remains at risk. Defendant has already demonstrated that its data security practices are inadequate to prevent unauthorized access to the PII in its possession. The PII of Plaintiff and Class Members remains stored on Defendant's systems, which have been shown to be vulnerable to compromise. So long as Defendant fails to undertake appropriate and adequate measures to protect this PII, it remains subject to further unauthorized access and disclosure.

124. Plaintiff and Class Members have suffered and will continue to suffer injury as a result of the Data Breach. The ongoing risk to their PII is not speculative—it is concrete, particularized, and traceable to Defendant's conduct. Social Security numbers cannot be cancelled or replaced in the way a credit card number can, and the risk of identity theft arising from their exposure persists indefinitely.

125. Defendant's existing remediation measures are inadequate. Defendant has offered only twelve months of single-bureau credit monitoring through CyberScout. This offering fails to cover all three major credit bureaus, covers only a twelve-month period despite the indefinite duration of the risk, and does not include identity theft restoration services or other protections commensurate with the scope of the breach.

126. Plaintiff seeks a declaration that: (a) Defendant owes ongoing duties to Plaintiff and Class Members to implement and maintain reasonable data security practices sufficient to protect their PII from further unauthorized access; (b) Defendant's existing remediation measures are inadequate to compensate for or protect against the ongoing risks created by the Data Breach;

and (c) Plaintiff and Class Members remain at substantial and imminent risk of identity theft and fraud as a result of the Data Breach, and this risk will persist indefinitely due to the immutable nature of Social Security numbers.

127. Plaintiff further seeks injunctive relief requiring Defendant to: (a) implement and maintain reasonable data security practices sufficient to protect the PII in its possession from further unauthorized access, consistent with the standards and frameworks identified herein; (b) engage independent third-party security auditors to conduct regular assessments of Defendant's data security practices and to report their findings; (c) implement and fund a comprehensive program of identity protection and restoration services for Plaintiff and all Class Members for a period commensurate with the risk created by the Data Breach; and (d) destroy all PII that Defendant no longer has a reasonable business or legal need to maintain.

128. Unless a class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, may continue to refuse to provide adequate remediation, and may continue to act as set forth in this Complaint.

129. A judicial declaration and injunctive relief are necessary and appropriate because Defendant has demonstrated that it cannot be relied upon to adequately safeguard the PII in its possession, and because the ongoing nature of the risk to Plaintiff and Class Members requires the Court's intervention.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that this Court enter judgment against Defendant and grant the following relief:

A. An order certifying the Class as defined herein, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. An award of compensatory, consequential, and nominal damages to Plaintiff and the Class in an amount to be determined at trial;

C. An award of restitution and disgorgement of the benefits unjustly retained by Defendant;

D. Injunctive relief requiring Defendant to: (i) implement and maintain reasonable data security practices sufficient to protect the PII in its possession from further unauthorized access; (ii) engage independent third-party security auditors to conduct annual assessments and report to the Court; (iii) implement a comprehensive program of identity protection and restoration services for Plaintiff and Class Members for a period commensurate with the risk created by the Data Breach; and (iv) destroy all PII that Defendant no longer has a reasonable business or legal need to maintain;

E. Declaratory relief as set forth in Count IV;

F. An award of reasonable attorneys' fees, costs, and expenses;

G. Pre-judgment and post-judgment interest to the maximum extent allowable; and

H. Such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all issues so triable.

Dated: April 16, 2026,

Respectfully submitted,

By: */s/ Mark K. Svensson*
Mark K. Svensson (NY 5974290)
**MILBERG, PLLC**
405 East 50th Street
New York, New York 10022
Tel: (202) 975-0468
msvensson@milberg.com

Scott J. Falgoust*
**BRYSON HARRIS SUCIU & DEMAY PLLC**
5301 Canal Boulevard
New Orleans, LA 70124
(919) 585-5634
sfalgoust@brysonpllc.com
**Pro hac vice application forthcoming*
*Counsel for Plaintiff and the Putative Class*